This is a suit under the Workmen's Compensation Act, Act No. 20 of 1914, wherein in his petition plaintiff alleges that on July 17, 1940, while employed by defendant as a ditcher on a road construction job and while working on said job on said date, at about 3:00 o'clock in the afternoon, in the act of lifting a bridge with fellow employees, he strained or in some way hurt his back. He alleges further that at the time of the accident he told fellow workers of it and that the next day he informed his foreman of its occurrence and that the foreman thereupon sent him to defendant's hospital for treatment, and that defendant thereafter kept petitioner on its payrolls, at its regular wages, until September 5, 1940, at which time he was discharged; that the only reason for his dismissal was his inability to do the work for which he was employed; that as a result of the accident petitioner suffered injuries to the joints, muscles, ligaments, tissues or nerves of his back, which injuries caused him pain in his back, particularly in the small part thereof, and especially upon any movement of his back or body, and that said injuries have rendered him totally disabled from doing the kind of work he was doing at the time of the accident, or work of any reasonable character.
He further alleges that at the time of his accident he was making 47 1/2¢ per hour, for 8 hours a day and 5 days per week, a weekly wage of $19, and that he is therefore entitled to compensation at the rate of $12.35 for a period of not to exceed 400 weeks, and that in addition thereto he is entitled to needed medical care and attention up to $250. The prayer of the petition is in accordance with the allegations set forth.
In its answer, defendant admits that plaintiff was employed by it on the basis of 40 hours per week, but avers that the rate of pay was 47¢ instead of 47 1/2¢ per hour, and the defendant denies that plaintiff sustained any accident whatsoever, although admitting that petitioner did advise his foreman the next day of said alleged accident. Defendant also admits that the foreman sent plaintiff to the hospital, but denies an accident and contends that sending petitioner to the hospital was in accordance with the standard practice of giving its employees the benefit of any doubt in matters of this kind so as to afford them prompt medical treatment if such treatment were required.
After trial of the case Judge Herget reached the conclusion that plaintiff had failed to sustain the burden of proof of showing that he suffered an injury within the contemplation of the Workmen's Compensation Law which disabled him from performing work of a reasonable character, and consequently he rendered judgment in favor of defendant and against the plaintiff, dismissing his suit, and plaintiff has appealed.
At the outset it may be noted that this case was tried before Judge Womack and that Judge Herget rendered his judgment entirely on the record and was not in a better position to pass upon the case than we are.
A summary of the evidence is as follows:
John Stokes, witness for plaintiff, testified that he has been living in Scotlandville for the past 17 years and that his present occupation is foreman in the third ward for the police jury; that formerly he worked for the Mengel plant and that he has known the plaintiff about 15 years and that at the time he worked for the Mengel plant as foreman the plaintiff had worked under him as a laborer and that he found him to be a first class hand. He testifies further that prior to his accident of July 17, 1940, plaintiff always walked straight and was "full of pep," but that since the accident "every time I would see him he would have a crutch or stick"; that many times he saw him when plaintiff did not expect to be seen, and in effect this witness testifies that plaintiff's appearance plainly indicates that he is hurt. He also testifies that he had had business experience with this Negro plaintiff while handling laundry, and that he found his credit was good.
J.M. Shirley, witness for plaintiff, testifies that he was in the grocery store business in Scotlandville, and that from his dealings *Page 378 
with plaintiff his credit was good; that when he first came to Scotlandville (subsequent to accident) plaintiff had a crutch, and that since that time he has always seen him walking with a crutch or walking stick, and that he always thought he was crippled.
Robert Williams, witness for plaintiff, testified that at the time of the accident he was working close to plaintiff in the same crew, on the same construction job, and that at the time they were moving a bridge built of heavy timbers, inserting some 4 x 4's under the bridge and sliding it; that there were about ten men engaged in this operation and that the plaintiff had a hold of one of the 4 x 4's, the front end of which was underneath the bridge, and that they had a deeper bite under it than the others and that in effect that when the others released the weight from their 4 x 4's it fell on plaintiff Whitfield, who was under a strain trying to keep a nail on the 4 by 4 from going into him; that after this incident plaintiff left and cleaned up, and that the next morning plaintiff told him that he had hurt his back in that strain, and that thereafter plaintiff was put on light duty, such as picking up paper.
Alex Bell, witness for plaintiff, testified that he worked in the same gang for Dupont with plaintiff, and that plaintiff told him that he had gotten hurt; that he wouldn't say definitely what day it was.
Mrs. Gilbert Whitfield, plaintiff's wife, testified that prior to his accident of July 17th plaintiff was in good physical condition, "He could get around like a bird, he was frisky, but now is just like an old man. Even when he sits a while, he has to stand a while before he can get himself straight."
Gilbert Whitfield, the plaintiff, testified that he was 38 years old and had been living in Scotlandville about 19 years; that he had been working for Dupont regularly from 7 A.M. to 4:30 P. M., 5 days a week at 47 1/2¢ per hour, for some six weeks prior to the accident; that on July 17th he was one of 10 or 12 men engaged in moving a heavy wooden bridge by means of pry poles (2 x 4's about 7 or 8 feet long) and that he and Robert Williams were holding the same pole, and that suddenly the weight of the bridge fell on his pole 'and that "When it dropped on me, I throwed my back under it, and that blocked the boy that was helping me on this pole, and that throwed him to have to go to the front of the pole to release me." He states that after he was released he just dropped the thing down and went to the lavatory to see how he would feel walking around; that after he went to the lavatory he came back and found that they had practically completed moving the bridge and he went to "back filling," throwing dirt in the hole. He states that he told Alex Bell about his accident that afternoon, when they were washing their tools, and that he told Malcolm Lagarde, another fellow worker, about the accident on the bus going home that same evening, and that he also told his wife about it that same evening; that the next day Mr. J.B. Easterly sent him and three other boys, to get some 12 x 6's, and that as he attempted to pick up one of these timbers "I gave completely down in my back, and I reported to Mr. Easterly. I said 'I hurt my back yesterday on the bridge,' " and thereupon Mr. Easterly sent him to the first aid station where they taped his back and sent him back to do light duty, such as picking up paper. He states that thereafter he received treatment from the company doctor, Dr. Bean, every day until the time he was laid off on September 5th; that he would apply a light on his back for a period, he believes, of 30 minutes. He states that when he was laid off on September 6th, he was not told anything by the company doctor, and was not given any kind of examination.
Plaintiff testified that he had had other industrial work with the Solvay company and with Stone Webster Engineering Corporation; that while employed by Stone Webster engaged in the lifting of heavy pieces of stone, a heavy piece of stone struck him in his chest and hurt his chest and his back and that his injuries from that accident disabled him from working and that later referred his case to an attorney and the case was compromised. The record of the case was introduced in evidence by the defendant, and shows that he compromised for the sum of $350.
He also testifies that since the accident his back has always hurt him; especially when he exerts himself in any manner. And in the last note of evidence he testified that he was employed at the air base in Baton Rouge, driving a truck, and that in this work all he has to do is drive and release loads of dirt by means of a well greased lever, which works easily and is no strain on him, but that he still finds that he cannot do any heavy lifting at all and that when he attempts to lift anything heavy he always suffers pain. *Page 379 
The rest of plaintiff's lay testimony consists of testimony of Malcolm S. Lagarde, colored school teacher, who testified that at the time of the accident he was employed at the same plant and working in the same gang with plaintiff for Dupont, and that in about the middle of July, 1940, some time after the large wooden bridge had been moved, he went to the outhouse and found plaintiff there and that he told plaintiff "Come on and quit ratting on me, and he told me that he was hurt, that he had hurt his back. That was the same day, but later on in the day." This witness further testified that prior to the accident plaintiff walked very briskly, but that since the accident his walk and his movements are very slow, and in fact that his general appearance since the accident indicates that he was hurt and has not regained his former physical condition.
The medical testimony introduced by plaintiff consists of the depositions of Dr. Ladislas Lazaro and Dr. Lionel Bienvenu. These doctors both testified that they examined plaintiff for a back injury and concluded that he was suffering from a lumbar sacro strain, basing their finding almost entirely on subjective symptoms. Neither of these doctors examined the X-rays of plaintiff's back.
Defendant's testimony, with the exception of the testimony of John C. Creaghan, an impeaching witness, consists entirely of medical testimony.
Dr. Hirsch, witness for defendant, testified that he examined plaintiff on August 12, 1940, and that "the examination was entirely negative, with the exception of a few bad teeth," that he examined radiographs furnished him by the Company and that he found them negative for fractures or pathology of any kind. He states that in this examination he examined plaintiff's tonsils and that they were not infected at that time. He has no recollection of having examined plaintiff's prostate. He stated that plaintiff did give him a history of his accident substantially as alleged in the petition. His viewpoint seems to be that if he had obtained a sacro-iliac strain on July 17th that by August 12th it should have been greatly improved if not entirely cured, and states that in his private practice he had patients with a sacro-iliac condition caused by a false step, where they could not turn over in the bed, but that with a proper belt, in 24 or 48 hours they were back at work. He gives the definite opinion that this man has no sacro-iliac or lumbo-sacral strain, and bases that opinion on the negative radiograph and on the different motions which he caused the plaintiff to go through in his examination, such as stooping down and touching the floor without bending his knees, raising straight up, bending his back backwards, etc., all of which failed to reveal any tense condition of the muscles of the site of the sacro-iliac and all of which convinces him that plaintiff was not suffering any pain in the sacro-iliac region. On being asked whether or not he had applied the Gaensler test to both sides, he stated that he did not know what it was, and upon being asked whether or not he had given a sharp blow to the flanks to see whether there was any pain, he stated that he was sure that he did and that definitely there was no pain. On cross-examination, he admitted that if a patient had been suffering from a toxic condition, such as infected teeth, infected tonsils or an infected prostate that this condition would naturally affect a back strain and prolong it for a longer period than if the man was in normal condition.
Dr. Ashton Robins, witness for defendant, testified that he examined plaintiff on October 23, 1940, and again on October 9, 1941. With reference to his first examination that plaintiff stated that on July 7, 1940, he hurt his back while lifting a heavy weight. He claimed the weight slipped and he had to bear all the weight himself; that his back hurts him all the time; that stooping over hurts, and getting up after sitting down hurts, and that he has not been able to work since the accident; that with reference to his past medical history plaintiff told him that he had had an injury to his chest in 1937 as the result of picking up a heavy stone, and that he told him that this injury was higher in the back than the present one; that he found that he had chronically diseased tonsils, and bad teeth and an enlarged mushy prostate gland; that he complained of pain in both flanks on a sharp blow; that all tests for sacro-iliac were negative, meaning the Gaensler's test which he describes as "a test where you put the sacro-iliac on a strain, a movement of the sacro-iliac. In fact, the man complained so much of pain that the test could not be carried out accurately. In other words, the minute you began the test he said it elicited pain, the minute you would put him in position where he did not show any slipping of the sacro-iliac joint, because we never got a chance to *Page 380 
put the sacro-iliac under a strain." Dr. Robins testifies that the slightest effort to raise either leg straight elicited pain; that there was no impairment of motion of his lower back and that bending forward, sidewise and backwards indicated that his lumbar spine seemed to be freely flexible and movable. He concludes by stating that his diagnosis at the time was prostatitis, bad teeth, chronic diseased tonsils, and possibly chronic myocarditis, and that the backache the patient complained of was probably due to his prostate gland. He states further "I don't think he is suffering such pain as he says he is. Pain is a subjective symptom, and we have to take their word for it that they have it. We cannot prove they have it or don't have it, but there is no evidence of any bony condition or joint condition, in my opinion, causing his complaint." He states definitely that he does not believe plaintiff has a sacro-iliac or lumbo-sacral strain. He also expresses the opinion that a slight sacro-iliac strain from trauma will not last much over six weeks. And he also expresses the further opinion that in most real sacro-iliac and lumbar sacral strains there are objective symptoms. In a second report in which he was not questioned, contained in a letter marked "D-4", he shows that plaintiff has bad teeth, diseased tonsils, "Prostate: Palpated, normal," and concludes by saying: "I discovered no evidence of any injury on examination. It is my opinion that this man is a malingerer." That was the second examination on October 9, 1941.
Dr. John McKowen testified by deposition that he examined plaintiff on October 23, 1940, and that he later saw him with Dr. Hirsch October 6, 1941, and tells that as a result of his examination of X-rays furnished by DuPont Company plaintiff was entirely negative as to any back injury. He states that they examined his teeth, tonsils and prostate for possible signs of infection and that his throat and prostate were negative, and his teeth were infected. He states that plaintiff stated that he was hurt on July 17, 1940.
John C. Creaghan, witness for defendant, testified that he is an interviewer in the personnel office of DuPont Company; that he has known plaintiff since around 1936; that he was the one who hired plaintiff in June, 1940, and that among other questions asked him was whether or not he had ever been hurt or injured on any other job or if he had ever received any compensation of any kind, and that to this question plaintiff answered "No."
There are two questions to be considered in the light of the testimony reviewed hereinabove. The first of these is whether or not the plaintiff has proved to a legal certainty that he has sustained an injury as a result of straining on July 17, 1940, while assisting some ten fellow employees in the moving of the bridge by means of pry poles, and the second question is whether or not the plaintiff has proved to a legal certainty that on September 5, 1940, at the time when he was discharged from his job, he was totally and permanently disabled because of the injury sustained in said accident.
[1] It is to be noticed that the occurrence of the alleged accident is based almost entirely on the testimony of the plaintiff himself, and that while he was engaged in the moving of the bridge with some 9 or 10 fellow employees, that only one testified to any circumstances which would indicate an accident by straining as maintained by plaintiff. It is significant, also, that at the time of the alleged strain plaintiff made no remark to his fellow employees, but merely walked away from his work to the lavatory, as stated by him, to see how he felt, and that it was not until some time later that he informed any fellow employee of having hurt his back and it was not until the next day, upon being assigned to moving heavy timbers that he complained to his foreman that he was injured and thereupon was sent to the defendant's doctor for treatment. It appears that the alleged accident occurred on July 17th, but that he continued to work for the defendant until September 5th before being discharged, and there is no showing that he was forced to use a crutch or walking stick until after his discharge on September 5th. It would seem therefore that plaintiff's alleged accident is based on what he says occurred, together with what he told to some two or three fellow employees and one or two other witnesses, including his wife, supported by the testimony of two white men who state that he is a man of credibility, based apparently on slight acquaintance. On the other hand, the plaintiff's credibility is at least somewhat impeached by the fact that upon going to work for the defendant company he answered the question as to whether or not he had ever been injured while working for some other company in the negative, whereas it developed that some time prior thereto, he had *Page 381 
filed a suit for injury to his chest and back while employed by the Stone Webster Engineering Corporation, and had compromised his suit based on a claim of total and permanent disability for the sum of $350. Moreover, it appears that when he obtained his last position as a truck driver at Harding Field, he was examined and that no back injury was found and that he failed to reveal ever having sustained any injury to his back. The fact that the happening of the accident is based almost entirely on the statements of plaintiff himself and the fact that the attending circumstances are such as to largely discredit plaintiff's statement, convinces us that he has not proved the alleged accident to a legal certainty.
However, admitting for the sake of argument that plaintiff did sustain an accident as alleged on July 17th, the next question is whether or not this accident resulted in a compensable injury under the Workmen's Compensation Act. It is admitted that plaintiff was on the payroll until September 5th and if thereafter he was suffering from no injury disabling him from performing reasonable work, he is of course not entitled to compensation. The medical testimony as reviewed above seems to be unanimous to the effect that on that date, if he had an injury prior thereto, plaintiff was entirely recovered. Dr. Hirsch, Dr. Robins and Dr. McKowen, each of whom examined plaintiff, all reached the conclusion that he was not suffering from any sacro-iliac strain or back injury. Dr. Hirsch's first examination was made on August 12, 1940, less than one month after the accident, and Dr. Robins' examination of plaintiff the first time was on October 23, 1940, and he testified that at that time in his opinion plaintiff had no sacro-iliac strain and expresses the further opinion that if he had suffered a sacro-iliac strain on July 17th as claimed he should have recovered therefrom within six weeks. He expresses the opinion that plaintiff is a malingerer. Dr. McKowen examined plaintiff the first time on October 23, 1940, and also failed to find any sacro-iliac strain. These three doctors differ somewhat on their diagnosis of the condition of plaintiff's teeth, tonsils and prostate, but their opinion is unanimous to the effect that plaintiff did not suffer from sacro-iliac strain, or other back injury.
We agree with defendant's contention that the examinations of Drs. Lazaro and Bienvenu are not very helpful in determining plaintiff's condition, not that we do not have great respect for these two physicians, but because from their own testimony their examinations were superficial, and their conclusions based entirely on the statements made to them by the plaintiff. Their examinations were confined entirely to the particular back injury claimed by plaintiff, and were done without benefit of X-rays and don't include examination of plaintiff's teeth, tonsils or prostate, etc.
[2] The Counsel for plaintiff very ably contends that since the testimony of Dr. Bean, the defendant's doctor, was not introduced by the defendant, it must be presumed that his testimony would be unfavorable to defendant and favorable to plaintiff, and apparently goes so far as to contend that if Dr. Bean had testified, his testimony would have shown objective symptoms of plaintiff's back injury, which were present right after the accident and which probably had disappeared by the time he was examined by Dr. Hirsch. We agree with Counsel that it must be presumed, as testified by plaintiff, that he did go see Dr. Bean at the direction of his foreman and that he was treated by Dr. Bean, but we do not believe that the presumption can go so far as to establish a fact that is not supported by any other evidence; that is, that Dr. Bean found objective symptoms of injury.
[3] From this review we must conclude that the medical evidence preponderates to the effect that plaintiff was suffering from no disabling injury at the time of his discharge September 5, 1940; at least plaintiff has failed to prove to a legal certainty that he was suffering from a compensable injury at the time.
[4] In compensation cases, like in all other civil cases, the burden of proof rests with the plaintiff. He must make his case to a certainty, to make it probable is not enough. We have given this case our best attention and consideration and we have reached the conclusion that the plaintiff has failed to bear the burden of proof.
For these reasons, the judgment appealed from is affirmed. *Page 469